United States District Court
Southern District of Texas

**ENTERED**
September 30, 2020
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:19-cv-0247

WAYMON J. STEPHERSON, TDCJ #02109879, PETITIONER,

v.

BOBBY LUMPKIN, RESPONDENT.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE.

State inmate Waymon J. Stepherson, who proceeds *pro se*, is incarcerated in the Texas Department of Criminal Justice–Correctional Institutions Division ("TDCJ"). Stepherson filed a petition for a federal writ of habeas corpus (Dkt. 1) and a supplement to the petition (Dkt. 2), seeking relief from a state-court conviction. The respondent filed a motion for summary judgment (Dkt. 13) and a copy of the state-court records (Dkt. 14; Dkt. 15). Stepherson has responded (Dkt. 17), and his claims are ripe for decision. Having now considered the petition, motion, briefing, the applicable legal authorities, and all matters of record, the court determines that summary judgment should be granted for the reasons that follow.

## I.   BACKGROUND

### A.   Procedural Background

In 2016, a jury convicted Stepherson on two counts of aggravated robbery in the 300th District Court of Brazoria County, Case No. 77949-CR, Hon. K. Randall Hufstetler presiding (Dkt. 14-15, at 214-15).[1]   Stepherson pleaded true to two enhancements (*id.* at 214).   The jury sentenced him to 38 years in TDCJ on each count with sentences to run concurrently (*id.*).

Stepherson appealed.   On February 8, 2018, the First Court of Appeals affirmed the judgment against him.   *See Stepherson v. State*, 2018 WL 761644, No. 01-16-00396-CR (Tex. App.–Hou. [1st. Dist.] 2018, pet. ref'd).   The Texas Court of Criminal Appeals denied Stepherson's petition for discretionary review (PD-0298-18).

On January 18, 2019, Stepherson executed a state habeas corpus application (Dkt. 15-19, at 11-29) (WR-89,781-01).   The trial court entered findings of fact and conclusions of law recommending denial of relief (*id.* at 136-39).   On May 15, 2019, the Texas Court of Criminal Appeals denied the application without written order on the trial court's findings (Dkt. 15-15).

On August 1, 2019, Stepherson filed his petition for a writ of habeas corpus in these federal proceedings (Dkt. 1; Dkt. 2).

---

[1]   Throughout this memorandum opinion, the court's citations to specific pages in the record refer to the pagination of docket entries on the court's electronic case-filing ("ECF") system.

### B.  Factual Background

Stepherson was convicted of two counts of aggravated robbery.  The

appellate court summarized the facts as follows:

> Jaclyn Bond came home from work around 9:00 p.m. on May 7, 2015.
> She parked in her garage and stepped out of her car. Her now-
> husband, Jeremy Bond, came to the garage to greet her. A man came
> into the garage, pointed a gun at Jaclyn, and said, "Give me
> everything." The man took Jaclyn's purse, a bag she was carrying, and
> Jeremy's phone. He then ran away.
>
> Jeremy went inside and called 911. While he was reporting the
> incident, Jeremy saw a speeding car coming from the direction that
> the robber had run and reported that as well. Police arrived and
> Jeremy and Jaclyn gave a description of the robber. Jaclyn's credit
> cards were used that night.
>
> Detective C. Rogers was assigned to investigate the case. He obtained
> pictures of the video footage depicting the man using Jaclyn's credit
> cards. He emailed three of the pictures to Jeremy. Jeremy responded,
> saying the person in the photographs appeared to be the same person
> that robbed them. Jaclyn saw the photos but did not positively identify
> the person as the robber due to the angle of the picture.
>
> Detective Rogers later identified the car Jeremy saw speeding away
> after the robbery.  [Stepherson] is the owner of the car. Detective
> Rogers prepared a photo array using [Stepherson]'s driver's license
> photograph and pictures of other men that look similar to
> [Stepherson]. For the other men, Detective Rogers used pictures
> taken when they were taken into custody for offenses. He could not
> find any photographs of [Stepherson]'s face other than his driver's
> license picture.
>
> Three days later, Jeremy and Jaclyn went to the police station to
> determine if they could identify the robber in a photographic array.
> The array was conducted by a different officer who did not know
> which of the men in the array was the suspect. Jaclyn initially focused
> on a person other than [Stepherson] but concluded she was unsure if
> the robber was in the array. Jeremy identified [Stepherson] as the
> robber, saying he had about 85% confidence that [Stepherson] was

the robber.

[Stepherson] filed a motion to suppress the photo array, arguing the array was impermissibly suggestive. The trial court held a hearing. At the end of the hearing, the trial court denied the motion to suppress, finding that the array was not impermissibly suggestive.

*Stepherson*, 2018 WL 761644, at *1 (footnote omitted).[2]

As explained in the appellate opinion, the still photographs that Detective Rogers emailed to the Bonds were taken from the surveillance video footage at Walmart, where Jaclyn Bond's credit cards were used on the night of the robbery (Dkt. 15-6, at 41). Jeremy Bond told Rogers that he recognized the person in the still images as the person who had robbed them, and testified that the person in the photos had the "[s]ame clothing, same shirt, shaped face, same build" (*id.* at 41; *see id.* at 42-43).

According to their trial testimony and pretrial statements, neither Jeremy nor Jaclyn Bond remembered whether the person who robbed them had tattoos on his forearms. *See id.* at 52; Dkt. 15-7, at 32, 34. Jaclyn Bond testified, however, that the person's arms were "toned" (Dkt. 15-7 at 50). Additionally, when viewing a photo array on May 14, 2015, approximately a week after the robbery, Jaclyn Bond signed a witness statement that described the person who robbed her as

---

[2]      The court also explained that Stepherson's first trial had ended in mistrial.  *Id.* at *1 n.1 ("The hearing [on the motion to suppress] was held after a jury had been impaneled but before evidence had been presented. At the conclusion of the hearing, the trial court declared a mistrial because a juror had been involved in an automobile collision. One month later, a new trial began.").

having "muscular" forearms (Dkt. 1-1, at 11-12).  At trial, Detective Rogers testified that he did not recall any reports of tattoos on the perpetrator (Dkt. 15-7, at 122).  Trial counsel then asked the court to allow Stepherson to "come roll his sleeves up to display his tattoos to the jury' (*id.* at 122-23).  The judge responded, "As long as [Stepherson] understands that by testifying, he's waiving his Fifth Amendment right to remain silent" (*id.* at 123).  Counsel then stated, "We'll hold off on that one," and continued with his cross-examination of Rogers (*id.* at 122-23).

On the second day of trial, Stepherson's trial counsel attempted to bring a motion in limine to obtain the surveillance videotapes from the areas near where Jaclyn Bond's credit cards were used, arguing that the video evidence would be exculpatory (Dkt. 15-6, at 11-15).  The judge denied the request because counsel's motion was late and, after repeated questions, counsel could not satisfy the court that he knew that the video contained exculpatory evidence (*id.* at 12-15).

Stepherson raised three issues on appeal, including a claim that the six-person photo array used to identify him before trial was "tainted." Stepherson complained that Detective Rogers previously had emailed still photographs from the surveillance videotape to the Bonds, and additionally that Stepherson's photograph in the array was dissimilar from the other photos.  *Stepherson*, 2018 WL 761644, at *2.  The appellate court recited the applicable legal standards:

> A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial denies the accused due process of law. *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). In order for a photo array to be impermissibly suggestive, the record must show that

> (1) the out-of-court identification procedure was impermissibly suggestive and (2) the suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384 . . . (1968). At the motion to suppress, the defendant must prove by clear and convincing evidence that the out-of-court identification procedure was impermissibly suggestive. *Balderas v. State*, 517 S.W.3d 756, 792 (Tex. Crim. App. 2016).

*Id.* The court then held that the photo array in Stepherson's case had not been impermissibly suggestive:

> An impermissibly suggestive analysis seeks to exclude identifications of the defendant based on suggestive comments and acts from law enforcement officers rather than on the witness's recollection. *See United States v. Wade*, 388 U.S. 218, 228–29 . . . (1967). Jaclyn did not identify anyone in the photo array. Accordingly, it cannot be said that her identification was based on any impermissibly suggestive procedure. *See id.*
>
> For Jeremy, we hold [Stepherson] did not establish that showing him the emailed pictures and then showing him a photographic array three days later was impermissibly suggestive. As Jeremy noted at the hearing, the angle of the emailed pictures made it difficult to discern facial features. Instead, Jeremy's identification of the robber from the emailed pictures was based on clothing and body shape.
>
> When Jeremy was presented with the photo array, a different officer presented the array. That officer did not know who the suspect was. The picture of [Stepherson] was different from the ones sent in the email, showing [Stepherson]'s face from a straightforward angle. [Stepherson]'s body features were not shown, and the clothing was different. *See Belcher v. State*, 661 S.W.2d 230, 232 (Tex. App.–Houston [1st Dist.] 1983, pet. ref'd) (affirming showing to complaining witness two different photo spreads—two days apart—that had different pictures of defendant in each).

*Id.* at *2-3. The court further held that the use of Stepherson's driver's license photograph in the photographic array had not been impermissibly suggestive:

> [Stepherson] pointed out during the hearing that [Stepherson]'s

picture had a lighter background than the other images and that the image of him was sharper than the other pictures. Detective Rogers testified that he used [Stepherson]'s driver's license photograph in the photographic array. For the other men, he used pictures taken when they were charged with offenses. He testified [Stepherson]'s driver's license picture was the only suitable picture of [Stepherson] he could find. There are some differences between the background and sharpness in [Stepherson]'s photograph and the other pictures in the array. This is not enough, however, to establish that the array was impermissibly suggestive. *See Barley*, 906 S.W.2d at 33 (holding that "the procedures utilized might have been suggestive, but not *impermissibly* so" where photo array, out of necessity, contained photos with different lighting and background).

*Id.* at *3.  Finally, the court held that Stepherson's trial counsel had not rendered ineffective assistance in connection with the photo array because counsel had in fact raised the issues identified by Stepherson in his motion to suppress.  *Id.* ("Because he objected to the admission of the photographic array and obtained a ruling, [Stepherson]'s trial counsel cannot be ineffective for failing to do either of those things. *See* TEX. R. APP. P. 33.1(a)").

Stepherson then executed a state habeas application with five claims for relief, including multiple claims that his trial counsel had been constitutionally ineffective (Dkt. 15-19, at 11-29).  The trial court designated three issues for response (*id.* at 131-32), and Stepherson's trial counsel responded by affidavit (*id.* at 133-35).  The first issue pertained to Stepherson's forearms and tattoos.  Counsel stated in his affidavit that he and Stepherson had mutually agreed not to show his forearms to the jury after the trial judge stated that, by doing so, Stepherson would waive his Fifth Amendment right not to testify:

> To the best of my recollection, I asked the Judge during this point in the case whether Defendant could expose his forearms to show that he had no tattoos thereon.[3] The Judge informed me that so doing would waive Defendant's right to remain silent. At this point Defendant, co-counsel, and I decided not to display Defendant's forearms. This was a mutually agreed-upon decision based on the Judge's aforementioned cautionary statement. I agreed that this decision was in the best interest of my client. In a post-trial interview one juror told me that he had been interested to see my client's forearms. That juror, however, did not make clear to me that seeing said forearms would have changed his decision in the jury room

(*id.* at 133, ¶ 1).   The designated second issue pertained to the surveillance videotape.  Trial counsel averred that he had subpoenaed all camera footage in the area where Jaclyn Bond's credit cards were used on the night of the robbery, but that most footage had been deleted by the time he came on the case:

> Contrary to Defendant's assertions, I subpoenaed or investigated every single source of camera footage that Defendant asked me to. I was hired by Defendant several months after the incident made subject of prosecution, and by that time most relevant video footage had been deleted. My office did, however, subpoena all videos from Wal-Mart, Shell, and Murphy in the weeks leading up to the trial. A hired investigator and I spoke in person with store clerks and managers about retrieving the information relevant to this case. I kept Defendant constantly apprised of my efforts, so Defendant is fully aware of my due diligence with regard to this aspect of the case. . . .

(*id.* at 134, ¶ 2).  The third issue pertained to Stepherson's claim regarding biased jurors.  Trial counsel stated that Stepherson never objected to any jurors during voir dire and had told counsel that he was satisfied with the jurors selected:

> I do not recall the exact circumstances Defendant is referring to here. As the result of a mistrial at the first setting there were two different

---

3    Although trial counsel stated in his affidavit that Stepherson had "no tattoos," Stepherson claims in these federal habeas proceedings that he had "highly visible and easily identifiable tattoos."   *See, e.g.*, Dkt. 1, at 23.

8 / 32

jury selections in the trial in question. I recall that, at the second setting, Defendant had full autonomy and awareness during jury selection. Defendant was asked whether he approved of the selection process, whether he had any objections, and whether he was satisfied with the selection. Defendant answered all of these questions affirmatively at the time. Defendant never mentioned thinking the jury pool was poisoned by the testimony of other potential jurors.

(*id.* at 134, ¶ 3).  Counsel further stated that the remarks of potential jurors that had been identified by Stepherson in his state habeas application would not "be considered irreparably harmful to a potential jury pool" and, in fact, were "useful in helping the attorneys decide which potential jurors to strike" (*id.*).

The state habeas court entered findings of fact and conclusions of law and credited trial counsel's affidavit on each of the three issues (*id.* at 136-39). The habeas court determined that, after the judge's warning regarding the waiver of Stepherson's right to remain silent, counsel and Stepherson had agreed that it was in Stepherson's best interest not to show Stepherson's forearms to the jury (*id.* at 137).  Second, the court determined that counsel had subpoenaed or investigated all camera footage that Stepherson requested, including all videos from Wal-Mart, Shell, and Murphy (*id.* at 137-38).  Third, the court determined that Stepherson had not raised any issue regarding potential jurors at voir dire, that he expressed his satisfaction with the selected jurors, and that none of the quotes referenced by Stepherson would be "irreparably harmful" to a potential jury pool (*id.* at 138).  The habeas court therefore concluded that trial counsel had not rendered constitutionally ineffective assistance:

> In a post-conviction habeas corpus proceeding, the burden of proof is upon the applicant. Based on the above Findings of Fact, this Court concludes as a matter of law that the applicant's trial counsel was not ineffective, in that, there is no evidence that the allegedly deficient performance of the applicant's trial counsel in any way prejudiced his case.

(*id.*).  The court further concluded that Stepherson's writ did not otherwise show that Stepherson was entitled to habeas relief, and recommended denial of relief (*id.* at 139).  The Court of Criminal Appeals denied Stepherson's application (Dkt. 15-15).

Stepherson then filed this federal habeas petition.

## II.   LEGAL STANDARDS

### A.   *Pro Se* Pleadings

Federal courts do not hold *pro se* habeas petitions "to the same stringent and rigorous standards as . . . pleadings filed by lawyers."  *Hernandez v. Thaler*, 630 F.3d 420, 426 (5th Cir. 2011) (internal quotation marks and citation omitted).  "The filings of a federal habeas petitioner who is proceeding *pro se* are entitled to the benefit of liberal construction."  *Id.*

### B.   The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas corpus relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 205-08 (2003); *Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Under AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the

state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Cobb v. Thaler*, 682 F.3d 364, 372-73 (5th Cir. 2012).

Federal courts look to the "last reasoned opinion" as the state court's "decision." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012). "Where a state court's decision is unaccompanied by an explanation," and the lower courts did not issue a reasoned opinion, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding that there is a rebuttable presumption that the federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

Review under AEDPA is "highly deferential" to the state court's decision. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). To merit relief under AEDPA, a petitioner may not merely show legal error in the state court's "decision." *White v. Woodall*, 572 U.S. 415, 419 (2014) (stating being "merely wrong" or in "clear error" will not suffice federal relief under AEDPA). AEDPA review exists only to "guard against extreme malfunctions in the state criminal justice systems."

*Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (internal citation and quotation marks omitted). "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 572 U.S. at 419-20 (quoting *Richter*, 562 U.S. at 103). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant habeas relief under 28 U.S.C. § 2254(d)(1) only if the state-court decision "was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent. *See Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005). Under the "contrary to" clause, this court may afford habeas relief if the state court "reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Matamoros v. Stephens*, 783 F.3d 212, 215 (5th Cir. 2015) (internal quotation marks and citations omitted). To constitute an "unreasonable application" of clearly established federal law, the state court's determination "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods*, 135 S. Ct. at 1376 (internal citation and quotation marks omitted).

On factual issues, AEDPA precludes federal habeas relief unless the state court's adjudication of the merits was based on an "unreasonable determination of the facts in light of the evidence presented in the state[-]court proceeding." *See* 28 U.S.C. § 2254(d)(2); *Martinez v. Caldwell*, 644 F.3d 238, 241-42 (5th Cir. 2011).

### C.   <u>Summary-Judgment Standard</u>

 In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts of the case in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). However, AEDPA modifies summary-judgment principles in the habeas context, and Rule 56 "applies only to the extent that it does not conflict with the habeas rules." *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); *see Torres v. Thaler*, 395 F. App'x 101, 106 n.17 (5th Cir. 2010). "Therefore, § 2254(e)(1)—which mandates that findings of fact made by a state court are presumed to be correct—overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party." *Smith*, 311 F.3d at 668.

## III.   <u>ANALYSIS</u>

Stephenson's federal petition brings five grounds for relief, one of which is a five-part claim that his trial counsel was constitutionally ineffective.   The

13 / 32

respondent's summary-judgment motion does not argue that his claims are unexhausted, time-barred, or successive.   The court will address each claim in turn.

### A.    Fifth Amendment Claim

Stepherson argues that the trial court violated his constitutional rights in connection with his privilege against self-incrimination.  To qualify for the Fifth Amendment privilege against self-incrimination, a communication must be (1) testimonial in character, (2) incriminating, and (3) compelled.  *United States v. Velasquez*, 881 F.3d 314, 337 (5th Cir. 2018) (citing *United States v. Hubbell*, 530 U.S. 27, 34 (2000)).  Stepherson argues that the trial court erred when the judge warned trial counsel that, if Stepherson displayed his forearms for the jury, he would waive his right not to testify.  Based on *Velasquez* and other authority, he argues that his tattooed forearms were physical evidence, rather than testimony, and should not have implicated his right against self-incrimination.  The *Velasquez* court stated:

> The prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. If a tattoo is simply relied upon to identify a defendant, then the Fifth Amendment privilege against self-incrimination is not offended.

*Id.* at 337-38 (internal quotation marks and citations omitted) (citing *Schmerber v. California*, 384 U.S. 757, 763 (1966); *Holt v. United States*, 218 U.S. 245, 252-53 (1910); *Tasco v. Butler*, 835 F.2d 1120, 1124 (5th Cir. 1988)).  The court held

that the *Velasquez* defendants' tattoos were "analogous to physical evidence unprotected by the Fifth Amendment rather than being testimonial in character" because "[a]ll of the information that gave interpretation to the meaning of [the] tattoos was conveyed through the testimony of [other witnesses], not [the d]efendants." *Id.* at 338.

In this case, Stepherson argues that his forearms would have been exculpatory evidence because they had visible, identifiable tattoos. By Stepherson's account, however, he was not compelled to display his forearms and, if he had been permitted to display them, they would not have been incriminating. Therefore, Stepherson was not compelled to provide self-incriminating testimony, and the privilege against self-incrimination is not directly applicable to the habeas claims before the court.

The Fourteenth Amendment's Due Process Clause protects a state defendant's right to a fundamentally fair trial. *Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988) (citing, *inter alia*, *Darden v. Wainwright* 477 U.S. 168, 181 (1986)); *Kirkpatrick v. Blackburn*, 777 F.2d 272, 278 (5th Cir. 1985) (citing, *inter alia*, *United States v. Bagley*, 473 U.S. 667 (1985)).  On habeas review, a petitioner bringing a claim based on a trial error must show that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal citation and quotation marks omitted).  In other words, to warrant habeas relief, a petitioner must show that he

was prejudiced by the trial court's error.   *Id.*; *see Rhoades v. Davis*, 914 F.3d 357, 368 (5th Cir. 2019).

Stepherson argues that he was prejudiced because, "had he been allowed to display highly visible and easily identifiable tattoos, the jury would have agreed that he was the victim of irreparable mistaken identification" (Dkt. 1, at 23).   He also argues that the Bonds' identification of him was crucial because, without it, "the State had no evidence to substantiate the charge of aggravated robbery" (*id.* at 19).   He alleges that the prosecution's witnesses were not sufficiently certain of their identification of him and that their identifications were subtly coerced by the prosecution (*id.* at 20).

However, the trial transcripts show that the Bonds had no recollection of whether the person who robbed them had tattoos on his forearms or not.   Jeremy Bond testified that he did not remember "any sort of tattoos or anything on his forearms" (Dkt. 15-6, at 52).   Jaclyn Bond stated that thee perpetrator's forearms were "toned" or "muscular" (Dkt. 1-1, at 11-12; Dkt. 15-7, at 50), but also that she did not remember whether he had tattoos on his arms (*id.* at 32, 34).   Detective Rogers also testified that he did not remember any conversations or reports about tattoos (*id.* at 122).   Rather, Jeremy Bond's initial identification of the perpetrator from the still photographs was based on his physical build, the shape of his face, and his plain white shirt, black pants, and sneakers (Dkt. 15-6, at 51-52).   Jeremy Bond later identified Stepherson's driver's license photograph in a six-person photo array, without relying on tattoos or forearms as identifying characteristics,

16 / 32

and stated that he was "85% sure" of the identification (*id.* at 55).   Additionally, the prosecution's case against Stepherson was not based solely on the Bonds' identification, but also on Stepherson's use of Jaclyn Bond's credit card on the evening of the robbery, the presence of Stepherson's vehicle near the scene, and other incriminating evidence.   Stepherson does not demonstrate that his forearms would have been a "crucial, critical, or highly significant factor in the context of [his] entire trial."   *See Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988).

Stepherson fails to demonstrate that the non-display of his forearms to the jury had a "substantial or injurious effect" on the jury's verdict.   *See Brecht*, 507 U.S. at 637.   His conclusory allegations that he was harmed are insufficient to defeat summary judgment or to demonstrate that the state habeas court's denial of his claim was contrary to clearly established law or unreasonable under § 2254(d).

## B.   *Brady v. Maryland* Claim

Stepherson argues that prosecution violated his due-process rights when it failed to disclose surveillance video from Walmart, Shell, and Murphy, which he claims would have been exculpatory.

The Due Process Clause requires the prosecution to disclose material evidence that is favorable to the defense and material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83 (1963).   This duty to disclose "extends to all evidence known not just to the prosecutors, but 'to the others acting on the government's behalf in the case, including the police.'"   *Floyd v. Vannoy*, 894 F.3d

143, 161-62 (5th Cir. 2018) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).  A successful *Brady* claim requires a showing that "the prosecution suppressed evidence," that the suppressed evidence was "favorable to the defense" and "material to either guilt or punishment," and that the evidence "was not discoverable using due diligence." *Prystash v. Davis*, 854 F.3d 830, 837 (5th Cir. 2017).  Evidence is material under *Brady* "where it simply demonstrates 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Floyd*, 894 F.3d at 166 (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)).

In this case, Stepherson argues that prosecutors violated *Brady* because they failed to obtain and disclose surveillance video:

> In the instant case [Stepherson] was connected to offense charge[d] through the use of credit cards taken during a criminal transaction. Detective Rogers, the lead detective contacted [Stepherson] by phone and [Stepherson] explained to Rogers how he came to be in possession of said credit cards. . . . Rogers was told by [Stepherson] that he had acquired the credit card from an unidentified female in the Walmart parking lot.  Through negligence or indifference Rogers opted not to collect exculpatory video information that would have substantiated [Stepherson's] claim as to how he came to be in possession of the credit cards.

(Dkt. 1, at 26).  Stepherson argues it was unfair to have stills from the video but not the video itself, stating without explanation that the stills "tended to favor the prosecution" (Dkt. 1, at 26).   He also argues that the video would have "contradicted" the prosecution's timeline, apparently because it allegedly showed the presence of Stepherson's vehicle at the Shell station "during the approximate

time of the robbery" (*id.* at 31), which was in a different location.  Detective Rogers testified that he did not get a copy of the Shell station's surveillance video from the station manager, but that he watched the entire video and that Stepherson did not appear on it (Dkt. 15-7, at 102-03).  He stated on cross, "I admit I should have [gone] back and got the videos," but also testified that "there was nothing in the videos that would have showed anything different than the still shots that were taken of the videos." (*id.* at 125).

Stepherson's *Brady* claim fails because he has not shown that the prosecution suppressed the video evidence.  In fact, Stepherson's arguments rely on documents and testimony that were in the trial record and, therefore, known to Stepherson and his counsel during trial (Dkt. 1, at 26-32 (citing trial testimony and exhibits)).  Rogers testified at length about the videos, and Stepherson's counsel cross-examined Rogers on the issue (Dkt. 15-7, at 125-27).  The state habeas court found that trial counsel was aware of the videos before trial but could not obtain them because, by the time he was hired for the case, the videos had been destroyed.  Because the defense was aware at trial that these videos existed, the prosecution did not suppress the evidence.  *See West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996) ("Evidence is not suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence") (internal quotation marks and citations omitted).

Additionally, Stepherson has not demonstrated that the video evidence was "favorable" or "material" as *Brady* requires.  *See Floyd*, 894 F.3d at 161.  He makes

the conclusory statement that the still photos from the video were more incriminatory than the videotape (Dkt. 1, at 26), but offers no specific facts to support his assertion. *See* Dkt. 17 at 4 (stating without elaboration that "[i]t would have made the trial fundamentally fair to have the entire video from which the SCREEN SHOTS were taken").   Moreover, at trial, when counsel requested to file a late motion for the videotaped evidence, counsel could not articulate specific facts supporting his argument that the evidence would have been favorable (Dkt. 15-6, at 12-15).

Stepherson therefore fails to show a *Brady* violation or to demonstrate that the state habeas court's denial of his claim was contrary to clearly established law or unreasonable under § 2254(d).

### C.   Jury Claim

Stepherson argues that his Fifth Amendment right to a fair trial was violated because several venire persons were permitted to make comments during voir dire that were generally prejudiced against criminal defendants, therefore "tainting" the entire venire.   The Sixth Amendment to the Constitution guarantees criminal defendants a trial by an impartial jury.   The "bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as a matter of law."   *Solis v. Cockrell*, 342 F.3d 392, 395 (5th Cir. 2003) (internal quotation marks and citation omitted).

In this case, Stepherson complains that multiple jurors made comments during voir dire that were biased against the presumption of innocence, a

defendant's right not to testify, and the offense of aggravated robbery (Dkt. 1, at 54-59).   However, none of the prospective jurors Stepherson identifies in his petition as being biased were actually seated on his jury.[4]  To the extent Stepherson asserts that the entire venire panel was "poisoned" by the voir dire questioning, he provides no facts sufficient to overcome the state habeas court determined that there was no irreparable harm:

> None of the quotes provided by [Stepherson] would be considered irreparably harmful to a potential jury pool. The questions also formed the basis of counsel's trial strategy (approved of by [Stepherson]) and were considered useful in helping the defense attorneys to decide which potential jurors to strike.

(Dkt. 15-19, at 138).

Stepherson fails to show that jurors were biased against him or to demonstrate that the state habeas court's denial of his claim was contrary to clearly established law or unreasonable under § 2254(d).

### D.    Ineffective Assistance of Counsel

Stepherson claims that his trial counsel was constitutionally ineffective, bringing five separate claims.   Under *Strickland v. Washington*, 466 U.S. 668 (1984), a criminal defendant claiming ineffective assistance of counsel must show that defense counsel rendered deficient performance and that the defendant was prejudiced:

---

[4]      *See id.* (naming prospective jurors Allen, Demouy, Wiggins, Thomas, Townsend, Smith, Taylor, Rhodes, Eaton, James, and Brinkley); Dkt. 15-5, at 172-73 (list of seated jurors).

> To demonstrate deficient performance, the defendant must show that, in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms." There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." . . . .
>
> To demonstrate prejudice under *Strickland*, [the defendant] must show that counsel's deficient performance was "so serious as to deprive him of a fair trial, a trial whose result is reliable." This requires the showing of a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different.

*Rhoades v. Davis*, 852 F.3d 422, 431-32 (5th Cir. 2017) (quoting *Strickland*, 466 U.S. at 687-89, 694). *Strickland* defines a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This requires a "substantial, not just conceivable, likelihood of a different result." *Pinholster*, 563 U.S. at 189 (internal citation and quotation marks omitted). The petitioner's burden to show a "reasonable probability" of changed outcome is less than a preponderance:

> The question is not whether the defendant would more likely than not have received a different verdict . . . but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles*, 514 U.S. at 434; *see United States v. Dominguez Benitez*, 542 U.S. 74, 83 n. 9 (2004). The prejudice inquiry is focused on the "fairness of the trial and the reliability of the . . . verdict in light of any errors made by counsel, and not solely the outcome of the case." *White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010) (internal citations and quotation marks omitted).

Review of counsel's performance is deferential, and counsel enjoy a strong presumption that their conduct is within the "wide range" of the bounds of professional norms. *Strickland*, 466 U.S. at 689. A petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Any "strategic decisions" made by trial counsel "must be given a strong degree of deference." *Rhoades*, 852 F.3d at 432.

On habeas review, when a state court has adjudicated a claim of ineffective assistance of counsel on the merits, the petitioner bears an especially heavy burden. The question is not whether the state court's application of *Strickland* was incorrect, but rather whether it was unreasonable.

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted). *See Trottie v. Stephens*, 720 F.3d 231, 240-41 (5th Cir. 2013) ("'even a strong case for relief does not mean the state court's contrary conclusion was unreasonable'" (quoting *Richter,* 562 U.S. at 102)).

### 1.    Fifth Amendment

Stepherson first claims that his trial counsel was ineffective because he failed

to object when the court warned that he could not show his forearms to the jury without waiving his Fifth Amendment right against self-incrimination. Stepherson cites to authority supporting his argument that displaying his forearm would not have waived his right. *See Velasquez*, 881 F.3d at 337-38 ("If a tattoo is simply relied upon to identify a defendant, then the Fifth Amendment privilege against self-incrimination is not offended"). He argues that his defensive strategy at trial was to show his "slender" and "tattooed" forearms, in contrast with Jaclyn Bond's statements that his arms were "toned" or "muscular" (Dkt. 17, at 8).

The respondent argues that trial counsel made a reasonable strategic decision and that Stepherson therefore cannot show deficient performance. The court need not decide whether Stepherson has demonstrated deficient performance because, for the reasons held above in connection with his Fifth Amendment claim, he has failed to show prejudice. As both of the Bonds testified at Stepherson's trial, neither recalled whether the person who robbed them had tattoos on his forearms (Dkt. 15-6, at 52; Dkt. 15-7, at 32, 34). As stated above, the Bonds' identification of Stepherson was not linked to his tattoos or his forearms, and the prosecution presented other incriminating evidence including Stepherson's use of Jaclyn Bond's credit card. Although Stepherson makes the conclusory statement that, if jurors had seen his tattoos, they would have been convinced of a "misrepresentation" and acquitted him, he cites to no specific facts that could show a "reasonable probability" that the verdict would have been

different. *See Rhoades*, 852 F.3d at 432.[5]  Additionally, Stepherson fails to show that he is entitled to habeas relief under § 2254(d)'s deferential standards.

### 2. *Brady* Claim

Second, Stepherson claims that his counsel was ineffective because he was not diligent regarding *Brady* material, in particular, the surveillance videotape.

Stepherson fails to demonstrate that counsel's performance was deficient in connection with the videos.  On state habeas review, the court determined that trial counsel had subpoenaed or investigated all video evidence but that, by the time he was hired, most footage had been deleted.  In these proceedings, Stepherson identifies no facts that could overcome the state habeas court's determination.

Additionally, Stepherson fails to show prejudice under *Strickland* because, as held above in connection with his *Brady* claim, he has failed to show that the video evidence was suppressed or exculpatory.  Stepherson has failed to show a "reasonable probability" that the verdict would have been different if his counsel had been diligent regarding *Brady* material. *See Rhoades*, 852 F.3d at 432.

For essentially the same reasons, Stepherson also fails to show that he is entitled to habeas relief under § 2254(d)'s deferential standards.

### 3.   Surveillance Video and Pretrial Motions

Third, Stepherson argues that his counsel was ineffective because he failed

---

[5]   Stepherson's claims that one juror expressed curiosity after trial about whether Stepherson had tattoos (*see* Dkt. 1, at 61) is insufficient to demonstrate that the juror would have voted to acquit him if the juror had seen his forearms.

to timely file motions to suppress and motions in limine regarding the surveillance videotape and still photographs from the videotapes (Dkt. 1, at 40-46; Dkt. 17, at 9-12).  He cites to a portion of the transcript from the second day of trial in which his counsel appeared to acknowledge that his office may not have timely filed a motion to suppress on Stepherson's behalf, although counsel also appears to state that he filed a motion in limine on the same topic (Dkt. 15-6, at 11-12).  The trial court denied counsel's request to file a new motion, stating "Your timing on this is late.  Your Motion to Suppress was heard already.  Your Motion in Limine was never presented" (*id.* at 15).

To the extent Stepherson faults trial counsel for not obtaining the videotaped evidence, he has not shown deficient performance or prejudice because, as stated above, he has not sufficiently overcome the state habeas court's determination that the evidence was destroyed before trial counsel was hired (Dkt. 15-19, at 137-38). Stepherson has made no showing of a "reasonable probability" that the result of his trial would have been different if counsel had made the motions or obtained the videotape, because he has not demonstrated that the videotape would have been favorable to his defense.  *See Rhoades*, 852 F.3d at 432.

To the extent Stepherson bases his claim on counsel's failure to suppress the still images from the videotapes, he fails to show prejudice under *Strickland* because, as held above, he relies only on conclusory statements that the still images from the videotapes were more inculpatory than the videotapes themselves.

For essentially the same reasons, Stepherson also fails to show that he is

26 / 32

entitled to habeas relief under § 2254(d)'s deferential standards.

### 4.  Suggestive Identification Procedures

Stepherson claims that trial counsel was ineffective in connection with the six-person photo array, which included Stepherson's driver's license photo.  He argues that law enforcement violated procedures and his rights when they presented the Bonds with a photograph of Stepherson was lighter than the others, and that trial counsel failed to preserve error (Dkt. 1, at 47-50; Dkt. 17, at 12-13).  The appellate court rejected this argument, holding that Stepherson's counsel had not rendered deficient performance because counsel had, in fact, moved to suppress the array on this basis and obtained a ruling from the trial court:

> As we have observed in [Stepherson]'s first issue, his attorney did raise this as a ground to suppress the photographic array. The trial court ruled on this ground, finding, "Further, in reviewing the photo lineup ... I will find that the photos that were used were not dissimilar.... All six photos were very similar insofar as the individuals depicted [and] did not impermissibly suggest one individual over ... any of the six." Because he objected to the admission of the photographic array and obtained a ruling, [Stepherson]'s trial counsel cannot be ineffective for failing to do either of those things. See TEX. R. APP. P. 33.1(a).

*Stepherson*, 2018 WL 761644, at *3.  Stepherson presents no facts sufficient to overcome this state-court decision, and fails to show that he is entitled to relief under *Strickland* or § 2254(d).

### 5.  Jury Claims

Fifth, Stepherson claims that his trial counsel was ineffective because counsel failed to object to two potential jurors, Allen and Demouy, who made

biased comments during voir dire about the presumption of innocence and other topics (Dkt. 1, at 51-52).  He argues that the jury box "is a holy place" and that the poisonous remarks by some venirepersons caused his trial to be "stillborn" (Dkt. 17, at 15).  However, as Stephenson acknowledges, both prospective jurors he identifies were challenged for cause and were not seated on the jury that convicted him (Dkt. 1, at 58; *see* Dkt. 15-5, at 36-37, 48-50, 172-73).

As stated above, the state habeas court found that Stephenson raised no objections with his counsel and expressed his satisfaction with the selected jurors, determining that "[n]one of the quotes provided by [Stephenson] would be considered irreparably harmful to a potential jury pool" and that the voir dire questions were "considered useful in helping the defense attorneys to decide which potential jurors to strike" (Dkt. 15-19, at 138).  The court therefore found no deficient performance.  Additionally, because the two venire persons about whom Stephenson makes specific complaints were not seated on the jury, he fails to show prejudice.

Stephenson fails to show that his counsel was constitutionally ineffective under *Strickland* and additionally fails to demonstrate that he is entitled to habeas relief under § 2254(d).

### E.    Actual Innocence

In his final claim, Stephenson argues that habeas relief is warranted because he is actually innocent (Dkt. 1, at 60-61).  He relies on *Herrera v. Collins*, 506 U.S.

390 (1993), and *Schlup v. Delo*, 513 U.S. 298 (1995).[6]  "Actual innocence means 'factual innocence and not mere legal insufficiency.'" *United States v. Jones*, 172 F.3d 381, 384 (5th Cir. 1999) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

> A petitioner who claims that he is actually innocent of the underlying crime must show that, based on reliable evidence not presented at trial by reason of a constitutional violation, it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.

*Morris v. Dretke*, 90 F. App'x 62, 68 (5th Cir. 2004) (citing *Calderon v. Thompson*, 523 U.S. 538 (1998); *Schlup*, 513 U.S. 298).

Stepherson's argument for his actual innocence claim relies on the trial court's warning when he requested to display his forearms to the jury:

> [Stepherson] asserts he is a victim of irreparable misidentification.  To establish his actual innocence, [Stepherson] requested of the court to display his clearly identifiable tattoos, prominently displayed on both arms, from wrist to elbow, for the [j]ury's determination. . . . [D]ue process and the interest of justice warranted the displaying of his tattoos before the jury, which would have proven exculpatory and would have established the improbability of the [complaining witnesses] missing the highly visible and identifiable tattoo, prominently displayed on both forearms.

(Dkt. 1, at 61).  Stepherson also relies on his assertion that one juror told trial counsel after the conviction that the juror was looking at the Walmart video to try to spot tattoos, but that the "video quality was too poor," claiming that if the juror

---

[6]    The respondent does not concede application of *Schlup*, arguing that *Herrera*'s more demanding standard applies and that Stepherson's claim fails because he has not shown an independent constitutional violation as *Herrera* requires.

had seen Stepherson's tattoos "he would not have convicted" (*id.*).

Stepherson fails to make the required showing that, more likely than not, "no reasonable juror would have convicted him" if his forearms had been displayed. *See Morris*, 90 F. App'x at 68. The trial record shows that the Bonds did not recall whether or not the perpetrator had tattooed forearms. Moreover, as stated above, the prosecution had sufficient incriminating evidence supporting the conviction that would not have been affected by the display of Stepherson's forearms, including his use of Jaclyn Bond's credit card. Additionally, Stepherson's assertion that one juror expressed curiosity about his tattoos is plainly insufficient to show that the juror would have voted to acquit if he had seen Stepherson's forearms.

Stepherson fails to satisfy the required showing for an actual innocence claim, and fails to demonstrate that he is entitled to habeas relief under § 2254(d).

## IV.   CERTIFICATE OF APPEALABILITY

Habeas corpus actions under 28 U.S.C. § 2254 or § 2255 require a certificate of appealability to proceed on appeal.  28 U.S.C. § 2253(c)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner.

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "'that reasonable jurists would find the

district court's assessment of the constitutional claims debatable or wrong.'" *Tennard*, 542 U.S. at 282 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal citation and quotation marks omitted). Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). After careful review of the record and the applicable law, the court concludes that reasonable jurists would not find its assessment of the claims debatable or wrong. Because the petitioner does not allege facts showing that his claims could be resolved in a different manner, a certificate of appealability will not issue in this case.

## V.   <u>CONCLUSION</u>

For the reasons stated above the court orders that:

1.      The respondent's motion for summary judgment (Dkt. 13) is granted;

2.     The petition for a writ of habeas corpus (Dkt. 1) filed by Waymon Stepherson is dismissed; and

3.     A certificate of appealability is denied.

The Clerk will provide a copy of this order to the parties.

Signed on Galveston Island this __30th__ day of __September__, 2020.


_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE